USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/28/12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

J.A. and S.A., individually and collectively and on behalf of N.A.,

Plaintiffs,

-against-

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant

----------------------------------X

10 Civ. 9056 (DAB)
MEMORANDUM & ORDER

DEBORAH A. BATTS, United States District Judge.

Plaintiffs J.A. and S.A., on behalf of N.A., filed this action against the New York City Department of Education ("DOE") on December 3, 2010, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, et seq., and the New York State Education Law, N.Y. Educ. Law §§ 4401, et seq., seeking reversal of an administrative decision of the State Review Officer ("SRO"), which denied private school tuition reimbursement for N.A. Both Parties now move for summary judgment. For the reasons stated herein, Plaintiffs' Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED.

# I. BACKGROUND

## A. IDEA

The Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., allots federal funds for states that offer a "free and appropriate public education" ("FAPE") to children with disabilities. 20 U.S.C. § 1412(a)(1)(A). The state must establish for each child an Individualized Educational Program ("IEP") that is "reasonably calculated to enable the child to receive educational benefits." Gagliardo v. Arlington Central School Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982)). If the school district fails to supply a FAPE, the child's parent may seek tuition reimbursement for the child's placement in a private school. 20 U.S.C. § 1412(a)(10)(C)(ii).

New York receives federal funds under this statute and charges Committees on Special Education ("CSE"s) with the responsibility of formulating the IEPs. The CSEs are established by local boards of education. N.Y. Educ. L. § 4402(1)(b)(1); 8 N.Y.C.R.R. 200.3(a). Each CSE is comprised of, among other people, the child's parent or guardian; the child's regular education teacher; the child's special education teacher; and a school psychologist. 8 N.Y.C.R.R. 200.3(a)(1). The CSE's membership also shall include "an additional parent

member of a student with a disability residing in the school district or a neighboring school district, provided such parent is not a required member if the parents of the student request that the additional parent member not participate in the meeting . . . ." 8 N.Y.C.R.R. 200.3(a)(1)(viii).

"New York parents who believe an IEP is insufficient under the IDEA may challenge it in an 'impartial due process hearing,' see 20 U.S.C. § 1415(f), before an [Impartial Hearing Officer ("IHO")] appointed by the local board of education, see N.Y. Educ. L. § 4404(1)." Bd. of Educ. v. Mills, No. 03 Civ. 50, 2005 WL 1618765 at *1 (S.D.N.Y. Jul. 11, 2005), quoting Grim v. Rhinebeck Central Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003). "At this hearing and throughout the subsequent administrative and judicial appeals process, the school district bears the burden of proving by a preponderance of the evidence that: (1) it complied with the IDEA procedural requirements; and that (2) the IEP was 'reasonably calculated' to confer 'educational benefits' on the students." J.R. v. Bd. of Educ of the City of Rye Sch. Dist., 345 F.Supp.2d 386, 394 (S.D.N.Y. 2004) (quoting Rowley, 458 U.S. at 206-07). "The Impartial Hearing Officer's decision may be appealed to a [State Review Officer, ("SRO")], see N.Y. Educ. L. § 4404(2); 20 U.S.C. § 1415(g), whose decision may be challenged in either state or federal court." Mills, 2005 WL 1618765 at *1 (citing 20 U.S.C. § 1415(i)(2)(A)).

B. Factual Background

Except where noted, the following facts are undisputed.

N.A., the son of J.A. and S.A., is a minor child who was ten years old at the time of the filing of this action. (Pls.' 56.1 Stmt. ¶ 1; Def.'s Resp. to Pls.' 56.1 Stmt. ¶ 1.) Since 2003, when N.A. was in preschool, the DOE has identified N.A. as a student with a disability in need of special education services. (Pls.' 56.1 Stmt. ¶ 7; Def.'s Resp. to Pls.' 56.1 Stmt. ¶ 7.) N.A. attended the Aaron School, a private school for students with disabilities located in New York, New York, continuously from the 2004-05 through the 2009-10 school year, the school year for which tuition is at issue in this action. (Pls.' 56.1 Stmt. ¶ 9; Def.'s Resp. to Pls.' 56.1 Stmt. ¶ 9.)

On May 1, 2009, the CSE convened to create an IEP for N.A. for the 2009-10 school year. (Def.'s 56.1 Stmt. ¶ 8; Pls.' Resp. to Def.'s 56.1 Stmt. ¶ 8.) Mrs. A met in person with school psychologist Rose Fochetta and special education teacher Feng Ye, both of whom are DOE representatives. (Pls.' 56.1 Stmt. ¶ 12; Def.'s Resp. to Pls.' 56.1 Stmt. ¶ 12.) Christine Canning, one of N.A.'s special education teachers from the Aaron School, participated in the meeting by telephone. (Pls.' 56.1 Stmt. ¶ 14; Def.'s Resp. to Pls.' 56.1 Stmt. ¶ 14.) The CSE team considered the following documentation: a December 2008

psychological evaluation report by Dr. Pamela Meersand; a December 2008 classroom observation report by Rose Fochetta; an April 2009 Related Service Progress Report by speech-language therapist Nancy Dreyfuss; a May 2009 Speech Language Therapy Progress Report by Aaron School speech-language therapist Robyn Finn; and a May 2009 Occupational Therapy Progress Report by Aaron School occupational therapist Rachel Kirschner. (IHO Ex. C, E, H, I, K. [1])

According to the "Summary and recommendations" section of Dr. Meersand's psychological evaluation report,

> N.A. is a very pleasant young boy with solid cognitive abilities. He is highly motivated for both social interaction and intellectual work, and has made superb progress in overcoming a number of developmental and learning challenges. Most of his academic skills are at or approaching grade level, and he demonstrates a particular talent for mathematical thinking. The following capacities continue to need strengthening: N.A.'s comprehension of abstract language; his grasp of complex social interactions; and self-management in the areas of attention, anxiety and over-stimulation.

(IHO Ex. C at 5.) During her December 2, 2008 classroom observation of N.A. at the Aaron School, Rose Fochetta concluded, "Overall, [N.A.] appeared to have difficulty remaining on task and required teacher redirection." (IHO Ex. E at 2.)

---

[1] "IHO Ex." refers to the exhibits entered into evidence by the Impartial Hearing Officer.

The May 2009 IEP contained a narrative assessment of N.A.'s then-present academic performance and learning characteristics:

> His recent psychological evaluation indicates that his overall cognitive functioning is found in the range of Average to Low Average. He presents with receptive-expressive and pragmatic language delays and grapho-motor delays. In class, he demonstrates attentional difficulties and weak organizational skills. He has difficulty stay[ing] on task for a lengthy period and needs teacher's check-ins to stay on tasks. He benefits from a lot of prompts for initiating work. He responds well to positive reinforcement. Academically, he is reported to have made good progress in math this year. He is reported to function in the range of early to mid 3rd grade level reading, the beginning 3rd grade level in writing, and on his grade level in math.

(IHO Ex. B at 3.) The IEP also included a tabular assessment of N.A.'s instructional grade-level in the areas of decoding, reading comprehension, writing, computation, and problem solving, which ranges from level 3.0 to level 3.8. Id.

The May 2009 IEP also contained a narrative assessment of N.A.'s social/emotional performance:

> Psychological testing conducted in November-December 2008 indicates cognitive scores ranging between average and low average. It was noted that he can be overwhelmed and fatigued when tasks are time-consuming, novel or ambiguous. When this happened, [N.A.] tends toward distractibility and withdrawal. [N.A.]'s understanding and use of language can be idiosyncratic, particularly when questions are abstract or involve social-emotional thinking. With regard to social-emotional development, he was described as highly motivated for social interaction. However, he continues to be challenged by his understanding of social-emotional life, coping with uncomfortable inner experience, such as overstimulation and anxiety without withdrawing and

> managing his attention. A current teacher report indicates that his struggles in school are related to attention, executive functioning, and pragmatic and expressive language. It was noted that he enjoys conversing with both teachers and peers. However, [N.A.] continues to be challenged with issues of eye contact, turn taking skills, social information processing, conversational skills, topic maintenance and pragmatic skills. He continues to work on his ability to resolve problems using appropriate words, expressing his thoughts and emotions more clearly and generating solutions more independently.

(IHO Ex. B at 4.) To address N.A.'s social emotional management needs, the IEP recommended "Access to sensory tools and sensory breaks and water breaks as needed," and "Body breaks which can be within the classroom as needed." Id.

The CSE team members were aware that "attention is a significant issue" for N.A. and that he has issues with grapho-motor skills, over-stimulation, and executive functioning. (Def.'s 56.1 Stmt. ¶ 15; Pls.' Resp. to Def.'s 56.1 Stmt. ¶ 15.) The team determined that N.A. "continues to require placement in a small, supportive classroom setting." (Def.'s 56.1 Stmt. ¶ 16; Pls.' Resp. to Def.'s 56.1 Stmt. ¶ 16.)

N.A.'s May 2009 IEP provided that he would be placed in a special class with a 12:1:1 staffing ratio (that is, a ratio of twelve students to one teacher and one paraprofessional) in a community public school as of September 2009. (Pls.' 56.1 Stmt. ¶ 36; Def.'s Resp. to Pls.' 56.1 Stmt. ¶ 36.) The IEP also recommended that N.A. receive related services over a twelve-

month period: including speech-language therapy and occupational therapy, with each service to be provided four times per week for 30 minutes individually and one time per week for 30 minutes in a group of two. (Pls.' 56.1 Stmt. ¶ 37; Def.'s Resp. to Pls.' 56.1 Stmt. ¶ 37.)

The team specifically considered a placement in a special education class with a ratio of twelve students to one teacher, but determined that that level of staffing would not sufficiently support N.A.'s attention deficits. (Def.'s 56.1 Stmt. ¶ 18; Pls.' Resp. to Def.'s 56.1 Stmt. ¶ 18.) Accordingly, the CSE reasoned, "[N.A.]'s need for continuous redirection warrants the additional support of a paraprofessional within the classroom." (Ex. B at 8.) The team also considered a 12:1:1 special education class without related services, but rejected this option as "insufficiently supportive" because N.A.'s "specific constellation of needs warrants the support of Speech and Language Therapy and Occupational Therapy for 12 months to prevent a regression of skills." (IHO Ex. B at 8.)

On June 10, 2009, the DOE mailed N.A.'s parents a Final Notice of Recommendation ("FNR") recommending placement at P.S. 2 for the 2009-10 school year. (Def.'s 56.1 Stmt. ¶ 31; Pls.' Resp. to Def.'s 56.1 Stmt. ¶ 31.) On June 15, 2009, N.A.'s mother visited P.S. 2 and met with the school principal and with

Mr. Sumner, the special education teacher who taught the class in which N.A. was to be placed. (Tr. 374-78, 395-97[2]; Def.'s 56.1 Stmt. ¶ 34; Pls.' Resp. to Def.'s 56.1 Stmt. ¶ 34.) On June 22, 2009, Mrs. A rejected the recommended placement, stating that P.S. 2 "does not have the support or services that my child requires and that are necessary to address [N.A.'s] academic and social and emotional needs," and requested another CSE review to discuss the recommended placement. (IHO Ex. M.)

On August 5, 2009, the CSE review panel convened for a second discussion of N.A.'s IEP for the 2009-10 academic year. At that meeting, Mrs. A explained several of her concerns about N.A.'s proposed placement. She worried that the classroom would be too distracting because "there was too much discussion and simultaneous kinds of conversation going on"; believed a classroom staff consisting of one teacher and "a para[professional] was not going to meet [N.A.]'s needs"; and was upset that the special education teacher had initiated a "personal conversation" touching on, among other things, her family during his meeting with her. (Def.'s 56.1 Stmt. ¶ 45; Tr. 380.) The CSE team advised Mrs. A to speak with DOE placement officer Nancy Funke about obtaining a new placement recommendation for N.A. (IHO Ex. N; Tr. 381.) Ms. Funke

---

[2] "Tr." refers to the transcript of the hearing before the IHO, held on five days between November 16, 2009 and March 3, 2010.

advised her that no alternative placement was available, and on August 6, 2009, Mrs. A wrote to the CSE, informing them that her attempt to secure an alternative placement for N.A. from the DOE was unsuccessful. (IHO Ex. N.) Approximately two weeks later, Mrs. A received another notice from the CSE, again recommending P.S.2 as N.A.'s placement for 2009-10. (Tr. 382.)

At the time N.A. was to be placed in Mr. Sumner's class, there were seven students in the class. (Def.'s 56.1 Stmt. ¶ 35; Pls.' Resp. to Def.'s 56.1 Stmt. ¶ 35.) By the time of the second hearing, convened at Mrs. A's request, three students had been added to the class, for a total of ten students. Id. Mr. Sumner testified that his class of 12:1:1 included students who experience overstimulation and require breaks. (Def.'s 56.1 Stmt. ¶ 37; Pls.' Resp. to Def.'s 56.1 Stmt. ¶ 37.) He also testified that he addresses his students' attention and sensory deficits by previewing material and by allowing for frequent breaks, according to the needs of individual students. (Def.'s 56.1 Stmt. ¶ 38; Pls.' Resp. to Def.'s 56.1 Stmt. ¶ 38.)

On November 6, 2009, Plaintiffs J.A. and S.A. requested a due process hearing, alleging that the DOE had denied N.A. a FAPE for the 2009-10 academic year and seeking reimbursement for N.A.'s tuition at the Aaron School for that academic year. (IHO Ex. AA) At a hearing held over five dates between November 16, 2009 and March 3, 2010, the IHO heard testimony and accepted

evidence from both parties. (Compl. ¶ 164; Answer ¶ 164.) On April 14, 2010, the IHO rendered a decision holding that the DOE did not provide N.A. a FAPE and awarding the parents tuition reimbursement. (Def.'s 56.1 Stmt. ¶¶ 61,63; Pls.' Resp. to Def.'s 56.1 Stmt. ¶¶ 61,63.) The DOE appealed the IHO's decision to the New York State Education Department's Office of State Review (the "SRO"). (Def.'s 56.1 Stmt. ¶ 64; Pls.' Resp. to Def.'s 56.1 Stmt. ¶ 64.) The SRO's August 5, 2010 decision sustained the appeal and denied the request for tuition reimbursement. (Def.'s 56.1 Stmt. ¶ 69; Pls.' Resp. to Def.'s 56.1 Stmt. ¶ 69.)

On December 3, 2010, Plaintiffs filed this action seeking review of the SRO's decision. Plaintiffs and Defendant have both filed Motions for Summary Judgment, which are presently before this Court.

## II. DISCUSSION

### A. The Summary Judgment Standard

A district court will grant summary judgment only when there is "no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000). Genuine disputes of material fact cannot be created by mere conclusory

allegations; summary judgment is appropriate only when, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party." Heublein v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993) (citing Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)).

In assessing when summary judgment should be granted, "there must be more than a 'scintilla of evidence' in the non-movant's favor; there must be evidence upon which a fact-finder could reasonably find for the non-movant." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). While a court must always "resolv[e] ambiguities and draw [ ] reasonable inferences against the moving party," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986) (citing Anderson, 477 U.S. at 252), the non-movant may not rely upon "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Id. at 12. Instead, when the moving party has documented particular facts in the record, "the opposing party must 'set forth specific facts showing that there is a genuine issue for trial.'" Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986). Establishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived "'to put up or shut up.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).

These same standards apply where, as here, there are cross-motions for summary judgment. Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc., 88 F. Supp. 2d 188, 193 (S.D.N.Y. 2000). A court faced with cross-motions for summary judgment need not "grant judgment as a matter of law for one side or the other," but "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Heublein, Inc., 996 F.2d at 1461 (quoting Schwabenbauer v. Bd. of Educ. of Olean, 667 F.2d 305, 313-14 (2d Cir. 1981))

B. Judicial Review under IDEA

IDEA actions are generally resolved on summary judgment. See, e.g., S.H. and B.P. ex rel. S.H. v. New York City Dep't of Educ., No. 10 Civ. 1041(PKC), 2011 WL 666098 (S.D.N.Y. Feb. 15, 2011); Thies v. New York City Bd. of Educ., No. 07 Civ. 2000 (RMB), 2008 WL 344728 (S.D.N.Y. Feb. 4, 2008). A federal court reviewing administrative proceedings under IDEA "shall receive the records of the administrative proceedings"; "shall hear additional evidence at the request of a party"; and "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

"The Supreme Court and [the Second Circuit] have interpreted the IDEA as strictly limiting judicial review of state administrative decisions." Grim v. Rhinebeck Central Sch. Dist., 346 F.3d 377, 380-81 (2d Cir. 2003), citing Rowley, 458 U.S. at 204-08; Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998). The reviewing federal court "must give 'due weight' to the administrative proceedings, mindful that the judiciary lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Grim, 346 F.3d at 381, quoting Rowley, 458 U.S. at 206-08 (internal quotation marks omitted). "Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful." Walczak, 142 F.3d at 129.

C. Tuition Reimbursement under IDEA

Parents who are dissatisfied with a school district's recommendations for their child for a given school year may place their child in a private school unilaterally and then seek retroactive tuition reimbursement from the local school district. 20 U.S.C. § 1412(a)(10)(C). The Supreme Court in School Comm. Of Burlington v. Dep't of Ed., 471 U.S. 359 (1985), set out a three-step test to determine whether to award private school tuition funding under IDEA. Id. at 370. The DOE is

required to pay for a program selected by the parent only if: 1) the IEP proposed by the school district was inappropriate; 2) the private placement was appropriate for the child's needs; and 3) the equities support the parent's claim. Id. at 374.

When reviewing the appropriateness of an IEP under IDEA as required by the first Burlington prong, "a district court must make a two-step inquiry: first, the court must consider whether the state has complied with the Act's procedural requirements; second, it must consider whether the IEP is 'reasonably calculated to enable the child to receive educational benefits.'" Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 (2nd Cir. 1997) (quoting Board of Ed. v. Rowley, 458 U.S. 176, 207-07 (1982)).

1. Procedural Adequacy of the IEP

Procedural compliance with IDEA "is no mere formality," as "adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." Rowley, 458 U.S. at 206. Nevertheless, not all procedural inadequacies render an IEP inadequate under IDEA. See A.C. ex rel. M.C. v. Bd. Of Educ. of Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 (2d Cir. 2005). Denial of a FAPE on procedural grounds alone can only be found only where the procedural inadequacies "(I) impeded the child's

right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); see also Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005) (explaining that while "procedural flaws do not automatically require a finding of a denial of a FAPE," "procedural inadequacies that individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP constitute a denial of FAPE.").

Plaintiffs contend that N.A.'s IEP is procedurally inadequate because the DOE failed to include evaluation procedures to be used in measuring progress towards his annual goals.

An IEP must include "a statement of measurable annual goals, including academic and functional goals designed . . . to meet the student's needs . . .; to enable the student to be involved in and make progress in the general education curriculum; and [to] meet each of the student's other educational needs that result from the student's disability." 20 U.S.C. § 1414(d)(1)(A)(i)(II); 34 C.F.R. § 300.320(a)(2)(i); 8 NYCRR 200.4(d)(2)(iii). An IEP must also contain a description

of "(i) [h]ow the child's progress toward meeting the annual goals . . . will be measured; and (ii) [w]hen periodic reports on the progress the child is making toward meeting the annual goals . . . will be provided." 34 C.F.R. § 300.320(a)(3); see also NYCRR 200.4(d)(2).

Here, there is no dispute that the "Methods of Measurement" sections of the IEP were left blank by the CSE team. However, Defendants argue that this error did not result in a loss of educational opportunity or seriously infringe on N.A.'s parents' right to participate in the creation of the IEP. Specifically, Defendants note, the SRO concluded that N.A.'s "proposed placement had evaluative mechanisms in place to assess the student, to measure the student's progress made on his goals, and to alter those goals and objectives if reevaluation indicated such a course were warranted." (SRO Decision at 13.) The SRO, despite acknowledging that N.A.'s IEP did not fully comport with state and federal regulations, thus found no evidence "establishing that the fact that the coding system was left blank would have deprived [N.A.] of a FAPE." (SRO Decision at 13-14.)

The Court sees no error in the SRO's conclusion. Although the CSE omitted information from the "Methods of Measurement" sections of the IEP, that omission did not interfere with N.A.'s right to a FAPE, significantly impede the parents' opportunity

to participate in the decision-making process, or cause a deprivation of educational benefits. N.A.'s May 2009 IEP contained annual goals and corresponding short-term objectives specific to N.A.'s deficit areas. Specifically, each of the 35 short-term objectives included in the IEP describes a skill N.A. needed to demonstrate in order to meet his goals, and 26 of the 35 specified a percentage of accuracy required. (IHO Ex. B. at 7-12.) For example, the IEP stated that "N.A. will develop self editing skills to identify grammatical errors such as capitalization and punctuation using a checklist with 80% accuracy." (Id.) The IEP also indicated at the top of the annual goals pages that three progress reports were to be issued during the 2009-2010 school year. (Ex. B at 7-10.)

The testimonial evidence received by the IHO further supports the SRO's determination. School psychologist Ms. Fochetta testified that the "Methods of Measurement" sections of the IEP were left blank intentionally in order to "allow[] . . . the teachers or the individuals working with [the student] the flexibility to determine the best way to work with him. Everyone has their own methods, their own styles, and we purposely leave that blank to allow the individuals who work with him the ability to determine the best way." (Tr. 59-61.) Mr. Sumner, N.A.'s proposed classroom teacher, offered testimony about the specific evaluation procedures that he would have used

to measure N.A.'s progress in the areas of decoding, reading comprehension, handwriting, writing skills, sensory processing, pragmatic skills, and problem solving. (Tr. 119-130.)

Further, courts in this district have held that similar omissions of information on the IEP do not result in the loss of educational opportunity or lead to the denial of a FAPE. See W.T. and K.T. ex rel. J.T. v. N.Y. City Bd. of Educ., 716 F.Supp.2d 270, 289 (S.D.N.Y. 2010) (leaving "measurement method" boxes blank on IEP did not constitute denial of FAPE); see also R.R. ex rel. M.R. v. Scarsdale Union Free Sch. Dist., 615 F.Supp.2d 283, 295 (S.D.N.Y. 2009) (failing to include expected levels of performance in IEP did not constitute a denial of FAPE).

Accordingly, the Court cannot conclude that the failure to include more-specific goals and measurement criteria in the IEP denied N.A. a free adequate public education for the academic year 2009-10 or impeded his parents' right to participate in the decision-making process during the creation of the IEP.

2. Substantive Adequacy of the IEP

"[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement."

Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 195 (2d Cir. 2005) (internal quotation marks omitted). School districts are not required to provide "every special service necessary to maximize each handicapped child's potential." Rowley, 458 U.S. at 199. Moreover, there is "a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (internal quotation marks omitted). "Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing the IEP's substantive adequacy." Cerra, 427 F.3d at 195.

Plaintiffs urge the Court to conclude, as the IHO did, that N.A.'s IEP was not substantively adequate because "the 12:1:1 ratio is insufficient to address [N.A.'s] significant needs for support, redirection, re-teaching and supervision." (Pls.' Mov. Mem. at 10; IHO Decision at 15.) Specifically, Plaintiffs argue that the SRO gave inadequate weight to the testimony of Ms. Blenman, N.A.'s homeroom teacher at the Aaron School, who testified that N.A. is "constantly internally distracted," (Tr. 286), causing him to require "constant redirection" during classroom instruction ,(Tr. 296), and "constant adult support," (Tr. 335). Plaintiffs argue that the SRO disregarded Ms.

Blenman's testimony in favor of the testimony of DOE witnesses and that doing so amounted to making an impermissible credibility assessment. Plaintiffs believe that Ms. Blenman's testimony, if given proper weight, shows that the DOE's 12:1:1 program recommendation and placement at P.S. 2 was substantively inappropriate to meet N.A.'s educational needs.

The record evidence, however, supports the SRO's conclusion that N.A.'s IEP was substantively adequate even in light of Ms. Blenman's testimony, and nothing in the SRO's decision indicates that the SRO doubted Ms. Blenman's credibility. In proposing a 12:1:1 program along with related services for N.A., the CSE specifically accounted for N.A.'s need for "placement in a small, supportive classroom setting," his need for "continuous redirection warrant[ing] the additional support of a paraprofessional within the classroom," and his "specific constellation of needs warrant[ing] the support of Speech and Language Therapy and Occupational Therapy for 12 months to prevent a regression of skills." (IHO Ex. B at 8.) Moreover, Mr. Sumner testified, after reviewing N.A.'s IEP and meeting with his mother, that N.A. was functionally similar to the other students in his class, and that "since he would be [one of the] higher functioning students in the room . . . he would develop a lot of confidence in his abilities." (Tr. 132.) Further, Ms. Fochetta, after conducting a classroom observation of N.A.,

testified that the proposed placement was an "appropriate recommendation," particularly given the potential benefits to N.A. of being educated alongside non-disabled peers at P.S. 2. (Tr. 55-6.)

Mr. Sumner further testified that the principal and assistant principal supervise the students during lunch and that "[they] are very much aware of my classroom and the student[s] in it. And . . . if one of them is not having a good day I'm always going to let them know that . . . so they know to give that child a break or leeway or whatever it is they need." (Tr. 236.) As the SRO noted, "the recommended placement would have assisted the student with transitions from large group settings upon both arrival at the school and lunch and recess back to a classroom environment under supervision; moreover, the hearing record indicates that school personnel would have been able to accommodate the student's difficulties with crowds and loud noises, further facilitating his transitions within the school and addressing his Aaron School homeroom teacher's recommendation for a 'micromanaged' school environment." (SRO Decision at 21.) In light of the advantages the SRO believed the proposed placement would have offered N.A. in terms of social development and the record evidence showing that P.S.2 personnel would have been able to assist N.A. with his difficulties with crowds and loud noises, Ms. Blenman's credible

testimony concerning his social limitations does not present sufficient grounds to hold that N.A.'s IEP was substantively inadequate to meet his needs.

The Court declines to find that the SRO's substantive disagreement with the IHO concerning the adequacy of the IEP constitutes an impermissible judgment as to witness credibility. Nothing on the face of the SRO's decision indicates that the SRO did not believe Ms. Blenman to be truthful. To the contrary, the record shows that the SRO properly considered the testimony of all the witnesses, including that of Ms. Blenman, as well as the documentary evidence submitted by all Parties, and concluded that the IHO had erred in determining that the IEP was substantively inadequate. No evidence in the record suggests that the SRO's disagreement was the result of an impermissible credibility assessment rather than a difference of opinion among educational policymakers concerning the appropriate inferences and conclusions to be drawn from all of the evidence concerning proposed educational programs and their adequacy in addressing N.A.'s specific individual educational needs.

The Court may not choose "between the views of conflicting experts on a controversial issue of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence," Grim, 346 F.3d at 383, and is in no position to second-guess the SRO's expert

determination of specialized questions concerning N.A.'s educational needs and the adequacy of the IEP in addressing those needs. Having reviewed the record in its entirety, the Court finds the SRO's decision to be careful and well reasoned, reflecting a thorough consideration of the arguments and evidence Parties raised at the IHO hearing. The SRO's determination must therefore be given the deference it is due as a state agency's final determination on questions within its peculiar expertise, including the adequacy of classroom staffing, the number of students to be placed in a classroom, and the educational supports necessary to address the student's specialized needs. Walczak, 142 F.3d at 129. Moreover, even if the Court did not appropriately defer to the SRO's expert determination, there is considerable evidence in the record on which to find that the IEP was substantively adequate to meet N.A.'s individual educational needs. The Court thus finds that the IEP was substantively adequate and tailored to enable N.A. was likely to make educational progress.

Because the Court agrees with the SRO that N.A.'s IEP was not procedurally or substantively inadequate, it need not and does not address whether the Aaron School would have been an appropriate alternative placement or whether the equities favor tuition reimbursement. See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 254 (2d Cir. 2009).

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED. The Clerk of Court is directed to enter judgment for Defendants and to close the docket in this case.

SO ORDERED.

Dated: New York, New York

March 28, 2012

Deborah A. Batts

Deborah A. Batts
United States District Judge